Ljubomir ANTEVSKI and Nevenaka Antevski, Plaintiffs–Appellants,

v.

VOLKSWAGENWERK AKTIENGE-SELLSCHAFT, a foreign corporation of the Federal Republic of Germany, Volkswagen of America, Inc., Importer and Distributor of Audi Motor Cars, and Audi–Nsu–Auto Union, A.G., Defendants–Appellees.

No. 92–3594.

United States Court of Appeals, Seventh Circuit.

Argued May 12, 1993.

Decided Sept. 10, 1993.

Donald W. Rice (argued), Matthew D. Soliday, Rice & Rice, Portage, IN, for plaintiffs-appellants.

Robert D. Brown (argued), Richard A. Mayer, Spangler, Jennings & Dougherty, Merrillville, IN, for defendants-appellees.

Before FLAUM and RIPPLE, Circuit Judges, and WILL, Senior District Judge.[*]

FLAUM, Circuit Judge.

After his accident in an Audi 5000, Ljubomir Antevski and his wife Nevenaka Antevski sued Audi, its parent Volkswagenwerk Aktiengesellschaft, and Volkswagen of America, Inc. The district court ordered a bifurcated trial, with the liability phase first. After a nine-day trial, the jury returned a verdict for the defendants. After plaintiffs moved unsuccessfully for a new trial, they brought this appeal. We affirm.

I.

Ljubomir Antevski was driving his 1983 Audi 5000 ST south along U.S. Route 41 outside of Lake Village, Indiana on the evening of April 30, 1988 when he was involved in a single-car accident. As Antevski's car approached a curve in the road, the right front and right rear wheels dropped four to five inches off the pavement and onto the gravel shoulder. Antevski's car proceeded straight, notwithstanding the curve, for approximately two car lengths before coming back onto the highway. At that point, the car went into a slide across the southbound lanes. While crossing the median, the car flipped over and came to rest in a northbound lane of the highway.

Antevski maintains that his accident was caused by a sudden unintended acceleration of his Audi 5000. According to his testimony, he pulled his car off to the side of the highway shortly after passing through Lake Village. After putting the transmission into park and turning off the engine, he exited the car in order to relieve himself. Then he lit a cigarette and got back into the car. After starting the engine, he placed his foot on the brake prior to shifting the transmission from park to drive. Once the engine had engaged, the car began to accelerate rapidly and unexpectedly. Allegedly, the sudden acceleration of Antevski's car, despite his attempts to brake, caused his accident and serious injuries.

When Antevski arrived at the hospital that night, he was alert and oriented. During a conversation with Linda Decker, the emergency room nurse, Antevski explained that the accident occurred when he lost control of his car while attempting to light a cigar (which was probably her abbreviation for cigarette). Decker wrote his explanation in the emergency room report that she prepared. The medical record of one of the attending physicians corroborated Decker's account. The reports of two other attending physicians supplemented this account with Antevski's report that he hit the brakes, which initially did not respond and then grabbed prior to the car's flipping over. Finally, John Cifaldi, a former business associate of Antevski, testified that he went to see Antevski after receiving a phone call from the hospital the night of the accident. Upon Cifaldi's arrival, Antevski told him that the

[*] The Honorable Hubert L. Will of the Northern District of Illinois, sitting by designation.

accident occurred after he dropped his cigarette and lost control of the car when he reached down to pick it up.

Following the accident, Antevski and his wife brought suit, alleging that the Audi 5000, being defective and unreasonably dangerous, proximately caused his accident. Specifically, the Antevskis' experts developed the theory that when three particular valves in the transmission body become jammed, unintended acceleration results. Tr. Vol. 2 at 24–71. They alleged that foreseeable changes in transmission oil pressure cause one of the valves, the kickdown valve, to move inward, drawing the throttle open and causing the car to run away. R. Vol. II, doc. 61 at 16. In addition, the Antevskis claim that the power brakes, which are vacuum-assisted, failed because no vacuum forms at the intake manifold when the throttle is open.

However, the Antevskis' experts could not determine whether any of the valves were jammed at the time of the accident. In fact, when the valves on Antevski's car were inspected subsequent to the accident, none was found to be jammed. William Rosenbluth, Antevski's engineering expert, conceded that there was absolutely no physical evidence that any valve was jammed in the Audi the night of Antevski's accident.[1] Tr. Vol. 5 at 179. Additionally, Robert Lang, Audi's engineering expert, offered testimony that the transmission in Antevski's car was not defective and that unintended acceleration could not occur in the manner the Antevskis' experts had hypothesized. Tr. Vol. 12 at 90–103. This testimony was consistent with studies conducted on Audis by the National Highway Traffic Safety Administration.

With respect to the brakes, neither side disputes that as a general proposition Audi's brakes are stronger than the engine and will always prevail over the engine. Therefore, regardless of the acceleration of the engine, the Audi's brakes would have been capable of stopping the vehicle despite any unintended acceleration. In this regard, when the Antevskis' experts inspected the brakes of the Audi, they found the components of the braking system to be within the manufacturer's specifications. Under plaintiffs' theory, the brakes could apparently be within specifications yet fail if the driver had attempted to pump them during the sudden acceleration. Antevski, however, offered inconsistent testimony as to how he actually attempted to apply the brakes. During his deposition, Antevski explained that as he shifted from park to drive, he had his foot on the brakes and continued applying the brakes throughout the episode. According to his deposition testimony, he attempted to put his left foot onto the brake pedal as well. Tr. Vol. 3 at 35–40. At trial, Antevski maintained that he had been pumping the brakes, Tr. Vol. 3 at 41–42, testimony which would better accord with the theory he and his experts were advancing.

The jury, after hearing the lengthy testimony, returned a verdict in favor of the defendants on the issue of liability. Subsequently, the Antevskis moved for a new trial on two separate grounds—the exclusion of three rebuttal witnesses and the use of allegedly perjured testimony of one of the defense witnesses. After a hearing, the district court denied the motion.

## II.

A denial of a motion for a new trial is reviewable for an abuse of discretion. *U.S.E.E.O.C. v. Century Broadcasting Corp.,* 957 F.2d 1446, 1460 (7th Cir.1992). Under this standard, the proper inquiry is not

---

1. Plaintiffs did attempt to establish that a two-position shift valve (the one-two governor plug) was actually stuck. Tr. Vol. 2 at 123. Reconstruction experts for both sides were in general agreement that Antevski's car was traveling at approximately 75 miles per hour when it went off the road. An Audi in first gear would not be capable of exceeding approximately 50 miles per hour. Thus, in order for plaintiffs' theory to be valid, they needed to establish that the car was at least in second gear prior to the alleged sudden acceleration. Plaintiffs' expert Robert Langley testified that the shift valve was discovered to be stuck in the innermost position, which would have caused the transmission to begin in second gear. Tr. Vol. 2 at 124. However, Langley himself had no personal knowledge that the valve in question was jammed. *Id.* at 134–35. Moreover, defendants' own inspection of the governor revealed that the plug was not stuck. *See* Tr. Vol. 12 at 101–03.

whether the reviewing court would have ruled differently if it were considering the case in the first instance, but rather whether the decision reached by the district court is reasonable.

█ In their principal argument, the Antevskis contend that they should have been allowed to put on three rebuttal witnesses to impeach Cifaldi's testimony. Counsel for the Antevskis intended to call Cosmo Hernandez, a police officer in Valparaiso, Indiana; Sharon Rodriguez, a former employee of Cifaldi; and Danny Van der Meter, her fiance. In his offer of proof, plaintiffs' counsel averred that on the morning following the accident, Cifaldi told each of them, while they happened to be present at Cifaldi's business, that Antevski had been in a serious accident in which his car had run away with him despite his attempts to apply the brakes. The Antevskis claim that the district court's decision to exclude this evidence violated their substantial rights. *See Hutter Northern Trust v. Door County Chamber of Commerce*, 467 F.2d 1075 (7th Cir.1972). Specifically, they contend that the district judge misapprehended the scope of the testimony plaintiffs' counsel would attempt to elicit from the three rebuttal witnesses.

█ The decision whether to allow rebuttal testimony is committed to the sound discretion of the trial court. *Spesco v. General Elec. Co.*, 719 F.2d 233, 240 (7th Cir.1983). In the present case, the district judge faced the significant obstacle of a separate acrimonious suit, apparently over the break up of their business partnership, that Antevski and Cifaldi were litigating in Porter County, Indiana. Throughout the nine days of trial, the district court repeatedly admonished one side or the other when they attempted to impeach witnesses with repeated references to that wholly unrelated litigation. Under these testing circumstances, the court labored to rein in the penchant for both parties to sling extraneous mud and largely succeeded in confining the focus of the products liability trial to the product. In evaluating whether to allow the three rebuttal witnesses to testify, the district court correctly recognized the risk that the parties would again attempt to revisit the Porter County litigation[2] as well as matters even further removed from the performance of Antevski's car, which would serve principally to underscore the intense personal animosity between Antevski and Cifaldi. In this respect, the Antevskis' counsel did not so much as hint that he would limit the scope of his examination of the three witnesses to the matter before the district court when he made his offer of proof. *See* Tr. Vol. 16 at 5–6. Given the substantial risk of prejudice and confusion of the issues, the district court did not abuse its discretion in denying the rebuttal witnesses the opportunity to testify.

█ In a supplemental motion, the Antevskis also contend that they are entitled to a new trial on the ground that Cifaldi may have perjured himself. If a verdict is based on false testimony, the district judge has the discretion under Rule 59 to grant the injured party a new trial. *Cf. Davis by Davis v. Jellico Community Hosp., Inc.*, 912 F.2d 129, 134–35 (6th Cir.1990). The Antevskis base their perjury allegation on an affidavit from Bill Taylor, an acquaintance of both Antevski and Cifaldi. According to Taylor's affidavit, Cifaldi, during a telephone conversation with Taylor, stated "I may go to Hell, but I got the son of a bitch!" R. Vol. IV, doc. 207. In fact, that is the entire substance of the affidavit. While recognizing that this single statement reported by Taylor at best implied perjury, the district judge did elect to hold a hearing in which he intended to conduct an examination of both Cifaldi and Taylor. Tr. Vol. 18 at 17. Taylor did not appear at the hearing. A note from his doctor indicated that he was unable to travel, apparently because of heart disease. R. Vol. V, doc. 215. Nonetheless, the district judge did personally interrogate Cifaldi and asked him repeatedly about the alleged statement as well as the veracity of his testimony generally. Tr. Vol. 18 at 3–13. Cifaldi denied committing perjury. After the hearing, the district judge denied plaintiffs' motion for a new trial.

█ Our more deferential review is particularly appropriate in a situation such as this one, in which the decision to grant a new

---

**2.** At oral argument, defendants' counsel asserted that at least one of the rebuttal witnesses—Rodri-guez—had testified in the Porter County case, a point opposing counsel did not dispute.

trial turns on a credibility determination. Without the opportunity to view Cifaldi's demeanor, we lack any reliable basis for overturning the district court's decision. Even considering the allegation in conjunction with the proffered testimony from the rebuttal witnesses, we are unable to conclude that the denial of a new trial violated the plaintiffs' substantial rights. Moreover, were we to conclude that the district court committed error in denying the motion for a new trial, the error would have been harmless in light of the entire record. *See Datamatic Services, Inc. v. United States,* 909 F.2d 1029, 1033 (7th Cir.1990). Although the Antevskis would have us believe that the defendants' case rose and fell with Cifaldi's testimony, the hefty trial record suggests otherwise. First, plaintiffs had ample opportunity, of which they took full advantage, to test the credibility of Cifaldi and to controvert his story both during cross examination and through the testimony of their own witnesses. And as the Antevskis' counsel acknowledged at oral argument, plaintiffs presented only a theory of how an accident might have occurred. They did not actually present any conclusive evidence that any of the valves in question did stick.[3] Tr. Vol. 5 at 140–43; R. Vol. I, doc. 44 at 5. Defendants, on the other hand, effectively rebutted plaintiffs' theory with detailed technical testimony on the actual performance of both the transmission and the brakes of the Audi. Moreover, both the emergency room nurse and at least one of the attending physicians explicitly corroborated Cifaldi's testimony regarding Antevski's preliminary explanation of the accident, namely that he was attempting to light a cigarette when he lost control of the car. Consequently, we are unable to discern any reason to upset the jury's verdict.

AFFIRMED.

---

3. This slippery theory with its various permutations has come under fire. *See* Peter W. Huber, *Galileo's Revenge: Junk Science in the Courtroom* 57–74 (1991). For example, one recorded demonstration of this "sudden acceleration" phenomenon in the Audi 5000, broadcast nationally by the television program *60 Minutes,* was actually rigged—with the unusually high transmission pressure facilitated by an external pump attached to the Audi transmission. *Id.* at 61. In fact, the most compelling and widely accepted explanation for this phenomenon is the inattentive driver slamming on the accelerator instead of the brakes.