**Thomas Walter GIBSON, Plaintiff,**

v.

**TOTAL CAR FRANCHISING CORPORATION, d/b/a Colors On Parade, Defendant.**

No. 1:01CV994.

United States District Court, M.D. North Carolina.

July 28, 2004.

James Gray Robinson, Robinson & Lawing, Winston–Salem, NC, for Plaintiff.

Jennifer Borum, Hunton & Williams, Richmond, VA, George W. Trey Aycock, III, Coltrane, Aycock & Overfield, PLLC, Greensboro, NC, Mark G. Evans, Conway, SC, for Defendant.

## MEMORANDUM OPINION

TILLEY, Chief Judge.

This matter is now before the Court on Defendant's Motion for Judgment after the Trial, or in the alternative for Amended Judgment [Doc. # 93], and Defendant's Motion for a New Trial on the Fraud Claim [Doc. # 95]. For the reasons set forth below, Defendant's Motion for Judgment after the Trial, or in the alternative for Amended Judgment will be GRANTED IN PART and DENIED IN PART. Defendant's Motion for a New Trial on the Fraud Claim will be DENIED.

### I.

Defendant Total Car Franchising Company ("TCFC") is a franchiser in the Colors on Parade franchise system. Colors on Parade franchisees perform mobile and fixed location paint repair, paintless dent removal, and interior repair on automobiles. Most TCFC franchise systems consist of three levels: the franchiser, an area developer, and franchisees. The Plaintiff, Thomas Gibson, and his partner, Don Campbell, became franchisees in the TCFC franchise system on February 15, 1993, with a license to use TCFC's trademark within most counties in Tennessee and in Northern Alabama, a territory which they divided among themselves so that Mr. Campbell's territory was Northern Tennessee and Mr. Gibson's was Southern Tennessee and Northern Alabama.

### A.

Evidence presented at trial by Mr. Gibson supported the following facts: After a conflict developed between Gibson and Campbell concerning Campbell's continuing encroachment into Gibson's territory, TCFC management suggested in December 1996, that Mr. Gibson sell his franchise interest to Gary Labro, a limited rights franchisee in Gibson's territory. TCFC appraised the franchise at a value of $194,826. (Pl.'s Ex. A at 1.) Mr. Gibson sold and transferred his franchisee agreement to Mr. Labro on February 26, 1997 for a purchase price of $168,000, which included a $138,000 promissory note, a security agreement that created an interest in the franchise,[1] and cash. On this date, Gibson and Labro signed a Franchise Transfer Agreement, and Gibson and TCFC signed a Termination and Release Agreement. The transfer was executed in Tennessee. Further, Gibson, Campbell, Labro, and TCFC all signed a Settlement Agreement in July 1997, although TCFC back-dated this document to February 26, 1997 to correspond to the date of the transfer.

The security agreement provided that, upon default, Mr. Gibson would resume operation of the franchise. The security agreement stated, "[t]o secure the payment to Creditor of the Secured Indebtedness, the Debtor hereby grants to Creditor a security interest in all of the Debtor's right, title and interest in his Colors on Parade Franchise Agreements ('Collateral')." (Pl.'s Ex. C at 1.)

Timothy Galfas, President of TCFC, and Thomas Hambrick, Director of Contract Compliance for TCFC, both reviewed and approved all of the documents associated with the transfer. In addition, TCFC was aware that Gibson would not sell the franchise without the assurance of a security agreement. However, Hambrick testified that TCFC never intended to honor the security agreement.

---

1. The security agreement is dated December 20, 1996.

After making a series of payments, Mr. Labro defaulted on the promissory note on September 15, 1998. Mr. Gibson sent demand letters to Labro on February 23, 1999 and June 3, 1999. Labro and Gibson agreed that in satisfaction of the obligation and pursuant to the security agreement, Labro would transfer the franchise back to Gibson. Mr. Gibson, through written communication to TCFC, claimed a security interest and requested transfer of the franchise. TCFC responded that Gibson did not have a security interest in the franchise. Mr. Labro asked Jim Squires, Mr. Galfas' successor as President of TCFC, to transfer the franchise to Gibson. Mr. Squires stated that "it would be a cold day in hell" before Mr. Gibson got his franchise back. As a result, Labro refused to transfer the franchise and, instead, abandoned it.

### B.

On August 28, 2001, Mr. Gibson filed suit against TCFC in the Superior Court of Forsyth County, North Carolina. TCFC removed the case to this Court on October 31, 2001. Mr. Gibson alleged that TCFC: (1) defrauded him by inducing him to sell his franchise to a purchaser through the promise of a security interest in the event of default; (2) committed unfair and deceptive trade practices; and (3) tortiously interfered with the contract between Gibson and Labro. TCFC moved for summary judgment on all of Mr. Gibson's claims. Summary judgment was granted with respect to the claim for tortious interference with a contract, but denied with respect to the claims for fraud and unfair and deceptive trade practices.

On January 15, 2002, the parties filed a joint Rule 26(f) report that set out their discovery plan. On January 29, 2002, Mr. Gibson served interrogatories and requests for production on TCFC. After a thirty-day extension of time, TCFC responded to the interrogatories on March 3, 2002. Mr. Gibson claims that the interrogatories addressing who ultimately became the franchisee of

Gibson's former area, specifically, interrogatories 2–4 and 10 (interrogatories and answers listed below), were insufficiently answered.

(2) Identify all persons employed by Defendant ... who participated in the decision to allow Gary Labro to transfer his franchise to someone other than Plaintiff.

*Defendant does not believe that any employees of TCFC allowed Gary Labro to transfer his former Area Developer franchise to anyone.*

(3) Describe all consideration ... for the transfer of the franchise owned by Gary Labro to third parties.

*None, not applicable.*

(4) Identify the persons, person, or entity which obtained ownership of the franchise formerly owned by Gary Labro.

*None, not applicable.*

(10) Identify all documents prepared for the transfer of the franchise from Labro to the persons identified in Interrogatory Number 4 and the person or persons who prepared them.

*None applicable.*

On April 2, 2002, TCFC responded to Gibson's request for production and denied that any documents existed regarding the transfer of the franchise. On May 21, 2002, Mr. Gibson's counsel, Gray Robinson, wrote to Mark Evans, TCFC's lead counsel, and stated that TCFC's responses could not be accurate and asked that the responses be supplemented. On May 30, 2002, Mr. Evans responded by letter to Mr. Robinson, stating that the interrogatories were completely and precisely answered. On October 14, 2002, Evans wrote another letter to Robinson, confirming that the franchise had not been transferred and that TCFC's responses would not be supplemented.[2] (Pl.'s Ex. U.)

On June 24, 2002, Mr. Gibson served a second set of interrogatories, specifically addressing whether anyone was operating the franchise in his former area, and if so, how

---

**2.** TCFC, in explanation of its responses, argues that the owner of the franchise did not transfer the franchise, but rather, he resigned, and that its answers in discovery were technically correct.

This would not, of course, account for the answer to No. 4 regarding who obtained ownership of the territory.

much TCFC received for the franchise. TCFC asked for and received a thirty-day extension of time to answer. TCFC responded on August 26, 2002, stating that, "[f]rom a preliminary check of the records, no franchisees are currently operating in the territory that used to be the franchise area of Gibson." TCFC argues that it answered the interrogatories truthfully because it does not know who is operating the franchise "on a daily basis." TCFC claims that it only knows who is licensed to work in a certain geographical area and that is different from what Gibson asked in his interrogatories.[3]

On October 8, 2002, Mr. Gibson conducted a deposition of Lynn Hearl, the person designated by TCFC as its 30(b)(6) witness. Mr. Gibson contends that the deposition revealed that the franchise area was being operated and, therefore, TCFC's responses to discovery were necessarily false. Mr. Gibson further contended that Ms. Hearl, as the Rule 30(b)(6) designee, knew very little about TCFC or the actions at issue in the litigation. TCFC responds that there was no one currently working at the company who had knowledge of the events that took place in 1996 and 1997 as a result of several changes in the management of the company. On October 9, 2002, Mr. Gibson demanded that TCFC correct its answers to discovery questions.

In addition to the discovery disputes described above, the parties also filed motions addressing various pleadings. Mr. Gibson filed an Amended Complaint [Doc. # 17] in state court on October 29, 2001 (and in this Court on July 16, 2002). On January 31, 2002, TCFC filed a Motion for a More Definite Statement [Doc. # 8] in response to Gibson's Amended Complaint. On October 21, 2002, this Court entered an Order denying the motion [Doc. # 36]. On November 1, 2002, TCFC filed an Amended Answer [Doc. # 40]. In response, based in part on TCFC's failure to provide complete and truthful answers to interrogatories, Mr. Gibson filed a Motion to Strike TCFC's Amended Answer [Doc. # 43] on November 6, 2002.

On March 14, 2003, a hearing was held to address Mr. Gibson's Motion to Strike [Doc. # 43] and Motion to Continue [Doc. # 46], and TCFC's Motion to Strike portions of the affidavits of Gibson and Hambrick [Doc. # 32]. Mr. Gibson's Motion to Strike was based on alleged discovery abuses, including the alleged failure to answer completely the interrogatories addressing who was "operating" in Mr. Gibson's former franchise area, and the presentation of an unqualified witness at a 30(b)(6) deposition. Mr. Robinson represented Gibson at the hearing. Mr. Evans, who was at that time General Counsel and President of TCFC,[4] did not attend the hearing because he was speaking at TCFC's annual convention. Trey Aycock, local counsel who appeared on behalf of TCFC, stated that he "was not made aware of [Mr. Evans' absence] until yesterday." (Mar. 14, 2003 Hr'g Tr. at 2.)

After discussion of the parties' discovery process, the Court denied the motions of all the parties.[5] The Court did, however, state that there was a possibility of sanctions against TCFC for discovery abuses. During the discussion of possible discovery sanctions, Mr. Aycock stated,

> I am a little less than pleased at being put in the position of coming here today and trying to explain this information, so you can rest assured, that if the Court entertains a lesser sanction, and Mr. Robinson might have some question about how forthcoming we will be with the information, I can assure him that I will drive to Conway,

---

3. TCFC argues that Mr. Evans answered the interrogatories truthfully because TCFC did not know who was operating the franchise "on a daily basis." TCFC claims that it only knew who was licensed to work in a certain geographical area and that is different from what Mr. Gibson asked in his interrogatories. In fact, as this matter was pursued in testimony before the Court, it became revealed that TCFC had licensed Mr. Campbell to operate the franchise area shortly after Mr. Labro "surrendered" it,

well before the interrogatories had been submitted.

4. The Court was not made aware of the fact that Mr. Evans was the current President of TCFC until the March 25, 2003 settlement conference.

5. Specifically, Gibson's Motion to Strike [Doc. # 43] and Motion to Continue [Doc. # 46], and TCFC's Motion to Strike [Doc. # 32] were all denied.

South Carolina and go through the warehouse and see what is there and put it in his [Mr. Robinson's] hands.

On February 28, 2002, the case was calendared for a jury trial to begin on April 7, 2003. At the end of the March 14, 2003 hearing, the Court set the trial date for April 21, 2003. The Court instructed TCFC to supply all responses to discovery questions by the Friday after the hearing, March 21, 2003, and extended the discovery period to allow Mr. Gibson to depose any witnesses that he deemed necessary after receiving the additional discovery information. The Court also stated that Mr. Gibson's counsel would be reimbursed for the costs of taking the depositions and the costs incurred as a result of pursuing information which had been withheld during discovery.

On March 25, 2003, both parties attended a settlement conference before Judge Osteen. The parties were unable to reach a settlement, but it was then revealed to the Court that Mr. Evans was currently the President of TCFC.

On April 4, 2003, the Court held another hearing regarding (1) TCFC's Motion to Reconsider the Summary Judgment Memorandum Opinion [Doc. # 62]; (2) TCFC's Motion to Compel Depositions [Doc. # 50]; and (3) Mr. Gibson's Renewed Motion to Strike the Answer [Doc. # 56]. Mr. Evans was present at this hearing. The parties addressed discovery issues further, specifically Mr. Gibson's Renewed Motion to Strike. Mr. Gibson's counsel stated that he received discovery documents after March 21, 2003, the court-ordered deadline for production, and that the documents that TCFC did deliver on March 21 were voluminous, included no index, no cover letter, or other explanatory information. Some items were Bates stamped and others were not. Documents labeled as Gary Labro's files, discussing his franchise with TCFC, were included in the materials. Mr. Gibson's counsel argued that these documents directly addressed Gibson's earlier interrogatories regarding who was operating in Gibson's former franchise and whether or not the franchise was transferred. (Apr. 4, 2003 Hr'g Tr. at 12.)

Mr. Gibson indicated that, based on the information received from TCFC, he would like to depose Mr. Evans regarding discovery responses and call him as a witness at trial. Mr. Evans indicated that he would withdraw as trial counsel. Evans stated, "if nothing else, I've become the centerpiece for the Court's attention and opposing counsel's attention." (Apr. 4, 2003 Hr'g Tr. at 46.) The Court responded that its attention was directed by the parties, not the Court.

A jury trial of this matter began on April 21, 2003. The Court, after reviewing evidence and arguments from a previous hearing on the matter, ruled that evidence regarding any continuing fraud or continuing effort to conceal any original fraud was admissible with regard to punitive damages. The Court also indicated that the jury instructions would include an instruction that the jury could consider whether TCFC's responses during discovery-in light of Mr. Campbell's having been awarded operating rights in Gibson's and Labro's former territory-constituted an effort to conceal that fact and, if so, what effect that might have. The following instruction was given to the jury:

> If you should determine that, after December 1996, employees or agents of the defendant intentionally took steps to conceal the intent with which the corporation acted in approving the security agreement between Mr. Gibson and Mr. Labro during the transfer of Mr. Gibson's franchise rights to Mr. Labro you may consider whether those steps were for the purpose of concealing an intent to misrepresent to Mr. Gibson in December 1996 what rights Total Car would recognize him to have in the event Mr. Labro should default on the promissory note.

In addition, possible concealment was listed as a factor the jury could consider in an award for punitive damages.

At the conclusion of the trial on April 25, 2003, the jury returned a verdict in favor of Mr. Gibson for the claim of fraud, but found that the statute of limitations barred recovery for any violation by TCFC of the Tennessee Consumer Act (the unfair and deceptive trade practice claim). The jury awarded Mr. Gibson a total of $220,155 in compensatory

damages. The jury, on the verdict sheet, specified two components to the compensatory damages: (1) the balance due on the promissory note ($176,124); and (2) estimated attorneys' fees ($44,031). In addition, the jury awarded $550,000 in punitive damages. After the jury delivered its verdict, TCFC's counsel asked to submit a question to the jury regarding the break-down in compensatory damages. The question submitted was: "Is $220,155 the amount of damages you have decided would place the plaintiff in the position he would have been had the fraud not occurred? Yes___ No___". The jury checked "Yes" and the question was signed and dated by the jury foreperson. On April 28, 2003, a judgment was entered based upon the jury's verdict.

## II.

For the reasons set forth in this section, TCFC's Motion for Judgment after the Trial, or in the alternative for Amended Judgment will be GRANTED IN PART and DENIED IN PART.

TCFC argues that, pursuant to Federal Rule of Civil Procedure 50, judgment after trial should be granted, or in the alternative, an amended judgment should be entered pursuant to Rule 59(e) because: (A) Mr. Gibson's fraud claims are deficient as a matter of law; (B) Mr. Gibson's claims against TCFC are barred by prior litigation; and (C) the jury's award of punitive damages and attorneys' fees was improper. TCFC argues that the claim in this case is a contract issue dressed up as a tort claim, and as a result, the outcome of trial, in particular the award of punitive damages, is flawed.

A motion for judgment as a matter of law after a verdict is returned is properly granted only if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party with respect to that issue." Fed.R.Civ.P. 50. A district court must view the evidence in the light most favorable to the non-moving party to determine "whether a reasonable trier of fact could draw only one conclusion from the evidence." *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 437 (4th Cir.2000).

The Fourth Circuit recognizes Federal Rule of Civil Procedure 59(e) as providing "three grounds for amending an earlier judgment: (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998) (citations omitted). Rule 59(e) "permits a district court to correct its own errors, 'sparing the parties and the appellate courts the burden of unnecessary appellate proceedings.'" *Id.* (internal citations omitted).

It is established that "Rule 59(e) motions may not be used ... to raise arguments which could have been raised prior to the issuance of the judgment, nor may they be used to argue a case under a novel legal theory that the party had the ability to address in the first instance." *Id.* (citations omitted). In the event that "a party relies on newly discovered evidence in its Rule 59(e) motion, the party 'must produce a legitimate justification for not presenting' the evidence during the earlier proceeding." *Id.* (citations omitted). As a general proposition, "reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly." *Id.*

### A.

As support for its Motion for Judgment after the Trial, or in the alternative for Amended Judgment, TCFC first argues that Mr. Gibson's fraud claims are deficient as a matter of law for four reasons: (1) Mr. Gibson's claims are barred by the economic loss rule; (2) Mr. Gibson's allegations are barred by the parole evidence rule; (3) Mr. Gibson's allegations are barred by the statute of frauds; and (4) Mr. Gibson failed to demonstrate the required elements for a claim of fraud.

### 1.

TCFC first argues that Mr. Gibson's claims are barred by the economic loss rule. Generally, the economic loss rule had its origins in product liability claims when purchasers, suing for defective products which had caused neither personal injury nor damage to other property, sought damages under

negligence or other tort theories for purely "economic" harms such as costs of repair and lost profits. The rule prevented parties from pleading tort claims in order to sidestep the application of warranty or contract law doctrine when the recovery sought in an action was actually one for warranty or breach of contract. *See Evans River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 866, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). Some states have adopted expansive applications, some have not. Some states include construction claims, some have included personal services. Some have expanded it to situations involving most, if not all, commercial contracts. The immediate question in this diversity case is whether the Supreme Court of Tennessee would expand application of the rule to prohibit the bringing of a fraud claim where Party C (TCFC) induces Party A (Gibson) to enter into a contract with Party B (Labro) with a representation that Party C would honor a security agreement between Party A and Party B when, in fact, it never intended to do so.

Tennessee has not adopted an expansive view of the rule. A survey of the cases containing the phrases "economic loss rule" or "economic loss doctrine" indicates that Tennessee courts have applied the economic loss doctrine or rule only in products liability, sales, and construction cases. *See, e.g., Ritter v. Custom Chemicides, Inc.*, 912 S.W.2d 128, 133 (Tenn.1995) (holding that "Tennessee has joined those jurisdictions which hold that product liability claims resulting in pure economic loss can be better resolved on theories other than negligence"); *Trinity Indus., Inc. v. McKinnon Bridge Co.*, 77 S.W.3d 159 (Tenn.Ct.App.2002) (holding that economic loss rule barred negligence claim by general contractor against a metal fabricator whose products were used in bridge that collapsed); *Tenn. Farmers Mut. Ins. Co. v. Ford Motor Co.*, 2002 WL 1332492 (Tenn.Ct.App. June 17, 2002) (products liability case involving three vehicles destroyed by spontaneous combustion) (unpublished); *Amsouth Erectors, LLC v. Skaggs Iron Works, Inc.*, 2003 WL 21878540 (Tenn.Ct.App. Aug.5, 2003) (holding that subcontractor could maintain negligent misrepresentation action for non-payment against project owner and project

manager) (unpublished); *Messer Griesheim Indus., Inc. v. Cryotech of Kingsport, Inc.*, 131 S.W.3d 457, 463 (Tenn.Ct.App.2003) (holding that "[t]he economic loss doctrine provides that '[i]n a contract for the sale of goods where the only damages alleged come under the heading of economic losses, the rights and obligation of the buyer and seller are governed exclusively by the contract'") (internal citations omitted).

There are no reported cases in which Tennessee courts have applied the economic loss doctrine to dismiss a fraud claim where the plaintiff was able to prove actual fraud, and there is no reason to believe the Supreme Court of Tennessee would do so. In fact, in *Messer Griesheim*, the Tennessee Court of Appeals upheld dismissal of the negligence claim based on the economic loss rule, but addressed the actual fraud claim separately and upheld dismissal on a different basis, that no reliance nor deceptive act had been shown. 131 S.W.3d at 469.

In addition, the United States Court of Appeals for the Sixth Circuit has considered the doctrine under Tennessee law. The plaintiff in *Jarrett v. Epperly*, 896 F.2d 1013 (6th Cir.1990), claimed that the defendant approached him about coming to work in the defendant's brake shop with the promise that the plaintiff would become owner of the brake shop if he worked there for ten years. The plaintiff entered into an employment contract with the defendant that included a $9,100 salary plus commission. *Id.* at 1015. When the defendant sold the brake shop ten years after the plaintiff signed his employment contract, the plaintiff brought claims both for breach of contract and for fraud. *Id.* The claim of fraud was based on the defendant's promise to sell the plaintiff the franchise after ten years, a promise which was not included in the plaintiff's employment contract. *Id.* at 1020. The claim of fraud was found to have survived.

In this case, Mr. Gibson is not seeking enforcement of the contract for his security interest. He is not even claiming that a contract between him and TCFC exists. The contract was with Mr. Labro. The present claim relates to TCFC's assertion that it

would allow Gibson to regain operation of the territory should Labro default on the contract payments when, at the time of the assertion, the responsible officers had no present intention to do so and knew Gibson would not have entered the agreement with Labro without that inducement. There is nothing to indicate the courts of Tennessee would apply the economic loss rule in this context.

### 2.

TCFC also argues that Mr. Gibson's fraud claim is barred by the parole evidence rule. However, this action is not an action for breach of contract, but an action in tort for alleged fraud. Therefore, it is unnecessary to discuss the parole evidence rule, which applies only to suits in contract, not tort. *Brungard v. Caprice Records, Inc.*, 608 S.W.2d 585 (Tenn.Ct.App.1980). Specifically, the parol evidence rule has no application in cases of promissory fraud. *See Lipford v. First Family Fin. Services, Inc.*, 2004 WL 948645 (Tenn.Ct.App. April 29, 2004) (unpublished).

### 3.

Similarly, it is unnecessary to discuss the statute of frauds which applies only to contract, not tort, actions. *Haynes v. Builders, Inc.* 546 S.W.2d 228, 232 (Tenn.Ct.App.1976).

### 4.

■ TCFC further argues that Mr. Gibson failed to demonstrate all the elements of fraud. The elements of promissory fraud in Tennessee are an intentional misrepresentation or promise by the defendant with regard to future action, made without the present intention to carry out the promise and made for the purpose of inducing action by the plaintiff who reasonably relied upon the representation and consequently suffered damage. *See, e.g., Stacks v. Saunders*, 812 S.W.2d 587, 593 (Tenn.Ct.App.1990). Evidence presented at trial satisfied all of the required elements. Mr. Gibson presented evidence [6] that: TCFC, through its representatives, made a false representation that it would honor the security agreement; TCFC was aware that Gibson would not sell his

franchise without a security agreement; and TCFC used the misrepresentation as a means to induce Gibson to sell, but never intended to honor the agreement. Mr. Gibson was reasonable in believing TCFC would allow him to resume operating the territory should Labro default and suffered damage as a result of not being allowed to do so. Therefore, Mr. Gibson's fraud claims are not deficient as a matter of law, and a judgment after trial or amended judgment cannot be granted on these grounds.

### B.

As a second reason supporting its Motion, TCFC argues that Mr. Gibson's claims are barred by prior litigation, specifically by principles of res judicata and collateral estoppel. Mr. Gibson filed suit against Mr. Labro on July 26, 2000 in Williamson County, Tennessee for defaulting on the promissory note. Mr. Gibson dismissed the complaint with prejudice on September 17, 2001. TCFC argues that the dismissal served to extinguish the underlying debt owed by Labro to Gibson, and therefore any attempts to enforce the terms of the promissory note are barred by the doctrine of res judicata. TCFC also argues that Gibson is barred from relitigating the validity of Labro's underlying debt by the doctrine of nonmutual estoppel.

TCFC's assertions may be correct, but nonetheless do not serve as a basis for the requested Rule 50 or 59(e) action. This case does not involve the relitigation or enforcement of the promissory note between Gibson and Labro. In fact, the promissory note states that default would result in Gibson recovering the franchise. Mr. Gibson does not seek to enforce the note or challenge its validity. The promissory note is only relevant to this case in the role that it played in the fraudulent representations. Therefore, res judicata and collateral estoppel do not bar the verdict nor subsequent award by the jury in this case, and are therefore not grounds for entry of judgment after trial or an amended judgment.

---

**6.** Through the testimony of Mr. Gibson and Mr. Hambrick.

274

## C.

Finally, as a third reason supporting its Motion for Judgment after the Trial, or in the alternative for Amended Judgment, TCFC argues that the jury's award of punitive damages and attorneys' fees was improper for two reasons: (1) an award of attorneys' fees was inappropriate because there was no statutory basis; and (2) the punitive damages award was excessive. For the reasons stated below, the judgment will be amended to reflect that the jury's award of attorneys' fee was improper. However, the punitive damage award will be upheld.

### 1.

■ The jury returned a verdict form awarding $176,124, representing the balance due Gibson on the promissory note, and $44,031, representing its estimation of attorneys' fees incurred by Mr. Gibson, for a total of $220,155. While the jury did indicate that it viewed $220,155 as the amount needed to "place the plaintiff in the position he would have been had the fraud not occurred,"[7] there is no evidentiary basis in the record to support an award of attorneys' fees. Mr. Gibson did not present evidence regarding any attorneys' fees he had incurred in pursuing this dispute. Therefore, the $44,031 portion of the verdict is improper. As such, the judgment will be amended pursuant to Federal Rule of Civil Procedure 59(e) to reflect total compensatory damages of $176,124, not $220,155.

### 2.

■ TCFC also argues that the punitive damage award of $550,000 was excessive, specifically, that the amount far exceeds "any reasonable compensation for the injuries the Plaintiff claimed." However, punitive damages are aimed not at compensating a defendant, but at deterrence and retribution. *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 432, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001); *Pac. Mut. Life*

Ins. Co. v. Haslip, 499 U.S. 1, 19, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) (holding that "punitive damages are imposed for purposes of retribution and deterrence").

■ A district court may set aside the verdict and grant a new trial when the damage award from the jury is excessive. *Occidental Life Ins. Co. of N.C. v. Pat Ryan & Assoc.,* 496 F.2d 1255, 1264 (4th Cir.1974) *cert. denied* 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed.2d 297 (1974). The Fourth Circuit has held that "[w]here a verdict is so excessive that it cannot be justified by anything in the record or anything of which the Court can take judicial notice, it is the duty of the judge to set it aside." *Va. Ry. v. Armentrout,* 166 F.2d 400, 407 (4th Cir.1948).

■ If a punitive damages award is grossly excessive, it violates the Due Process Clause of the Fourteenth Amendment. *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 562, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). In *BMW,* the Supreme Court provided three guideposts to use when examining whether an award is excessive under the due process clause: (1) the "degree of reprehensibility" of the wrongdoing; (2) "the disparity between the harm or potential harm suffered by the defendant and the punitive damages award;" and (3) "the difference between this remedy and the civil penalties authorized or imposed in comparable cases." 517 U.S. at 575, 116 S.Ct. 1589.

The Supreme Court reiterated these three guideposts in *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). There, the Court again declined to impose a bright-line ratio that a punitive damages award cannot exceed. *Id.,* 123 S.Ct. at 1524. The Court's jurisprudence has established that, in practice, few awards significantly exceeding a single-digit ratio of punitive-to-compensatory damages will satisfy due process. *Id.* Further, "[s]ingle-digit

7. Under Tennessee law, compensatory damages are the amount needed to compensate the plaintiff for actual injuries sustained and to place the plaintiff in the same position that he or she would have been in had the fraud not occurred. *Harrogate Corp. v. Sys. Sales Corp.,* 915 S.W.2d 812, 817 (Tenn.Ct.App.1995); *see also Boling v.*

*Tenn. State Bank,* 890 S.W.2d 32, 35 (Tenn.1994). And further, in this case, the jury answered "Yes," when asked by the Court: "Is $220,155 the amount of damages you have decided would place the plaintiff in the position he would have been had the fraud not occurred?"

multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1 . . . ." *Id.*

 Applying the first *BMW* guidepost to the case at hand, the jury found that TCFC defrauded Mr. Gibson by inducing him to sell his franchise agreement through a representation-that he would have a security interest in the franchise-that it never intended to honor. Mr. Hambrick testified that he had assured Gibson that if he sold his franchise to Labro he would retain a security interest in it. (Trial Tr. Vol. 1 at 131–32.) Mr. Hambrick testified that despite repeated assurances to Gibson, TCFC never intended to honor the security interest and was only using it as a means to induce Gibson to sell his franchise. (*Id.* at 134–36.) There was more than sufficient evidence to support a jury finding of malice. In fact, based on testimony that the territory was franchised to Campbell shortly after being "abandoned" by Labro and irrefutable evidence that TCFC had concealed that information during discovery,[8] the degree of reprehensibility in this case is very high.

The second *BMW* factor is the disparity between the harm suffered and the punitive damages awarded. In this case, after subtracting the $ 41,031 estimated attorneys' fees from the $220,155 total, the amount of compensatory damages found by the jury is $176,124, which represented the unpaid amount of the promissory note. The punitive award was $550,000, creating a punitive-to-compensatory ratio of about 3.12 to 1. This ratio falls well within the single-digit range suggested by the Supreme Court in *State Farm.*

The final *BMW* factor is the difference between the punitive award in this case and the civil penalties authorized or imposed in other cases. Under Tennessee law there is no statutory maximum or any other guidelines regarding the award of punitive damages. Tennessee law does provide several factors for the jury to consider when assess-

ing a punitive award, which include: (1) the defendant's financial condition; (2) the nature and reprehensibility of the defendant's actions; (3) the defendant's awareness of the amount of harm; (4) the duration of the conduct and the attempt to conceal the conduct; (5) the expenses the plaintiff suffered in an attempt to recover losses; and (6) whether once the misconduct was known to the defendant, defendant took remedial action. *Hodges v. Toof & Co.*, 833 S.W.2d 896, 901–902 (Tenn.1992).

The Tennessee Supreme Court states that "punitive damages are . . . awarded in cases involving fraud." *Inland Container Corp. v. March*, 529 S.W.2d 43, 44–45 (Tenn.1975). Several cases comparable to the one at hand, involved the award of punitive damages in amounts comparable to the award in this case, both in terms of the ratio of punitive to compensatory damages and in the total dollar amount awarded. *See Cook v. Hanner*, 2003 WL 21170486 (Tenn.Ct.App. May.20, 2003) (awarding damages at a punitive-to-compensable ration of 2.7 to 1) (unpublished); *Agristor Leasing v. AOSHPI*, 869 F.2d 264 (6th Cir.1989) (affirming based on Tennessee law an award of punitive damages in the amount of $500,000 on theories of fraud and negligent misrepresentation).

At a ratio of 3.12 to 1, the punitive damages awarded in this case are the basic equivalent of trebled damages. Trebled damages are often accepted as an appropriate measure for deceptive conduct such as that found in this case. *See* Tenn.Code Ann. § 47–18–109(a)(3); *see also* N.C. Gen.Stat. §§ 75–1.1, 75–16; S.C.Code Ann. § 39–5–140(a); Va.Code Ann. § 59.1–9.12(b).

After reviewing those factors cited by the Supreme Court in *BMW, Cooper,* and *State Farm,* it is determined that the jury's punitive damage award of $550,000 is not constitutionally excessive and should be allowed to stand.

In short, TCFC's Motion for Judgment after the Trial, or in the alternative for Amended Judgment will be GRANTED IN

---

**8.** The concealment is evidenced by Mr. Evans making the affirmative statement that he did not know who was operating the franchise area and

his later refusal to correct the statement when asked.

PART AND DENIED IN PART. Specifically, the portion of the jury's verdict allotted to attorneys' fees, $44,031, is not supported by the evidence. Therefore, the verdict will be amended pursuant to Federal Rule of Civil Procedure 59(e) so that the total compensatory damages awarded will be $176,124. However, the punitive damage award of $550,000 will stand.

### III.

For the reasons set forth in this section, TCFC's Motion for a New Trial on the Fraud Claim will be DENIED. Rule 59 states that "[a] new trial may be granted to all or any of the parties and on all or part of the issues ... [for] any ... reason heretofore recognized as grounds for new trial." In the Fourth Circuit, when considering a motion for a new trial, a trial judge may weigh the evidence and consider the credibility of witnesses, and if he finds the verdict is against the clear weight of the evidence, is based on false evidence, or will result in a fundamental miscarriage of justice, he must set aside the verdict, even if supported by substantial evidence, and grant a new trial. *Conner v. Schrader–Bridgeport Int'l, Inc.*, 227 F.3d 179, 200 (4th Cir.2000).

The first two prongs of the standard require determination of "purely factual questions," that is, whether the verdict is (1) against the weight of evidence, or (2) based upon evidence that is false. *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors Inc.*, 99 F.3d 587, 594 (4th Cir.1996). If the court is of the opinion that the verdict is based on either of these enumerated grounds, the court has a duty to remove the case from the jury and recommit it to a new one. *Mattison v. Dallas Carrier Corp.*, 947 F.2d 95, 108 (4th Cir.1991). The trial court's exercise of its power to grant a new trial "is not in derogation of the right of trial by jury but is one of the historic safeguards of that right." *Id.* (quoting *Aetna Cas. & Sur. Co. v. Yeatts*, 122 F.2d 350, 352–353 (4th Cir.1941)).

The decision to grant or deny a motion for a new trial lies at the heart of the district court's sound discretion and "will not be disturbed absent a clear showing of abuse of discretion." *Wilhelm v. Blue Bell, Inc.*, 773 F.2d 1429, 1433 (4th Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1199, 89 L.Ed.2d 313 (1986). Where a new trial is granted on the grounds that "some undesirable or pernicious influence has intruded into the trial," the trial court's discretion is broader than if the new trial "is granted on the ground that the verdict is against the weight of the evidence." *Massey v. Gulf Oil Corp.*, 508 F.2d 92, 94 (5th Cir.1975) (contrasting appellate standard of review of trial court's decision to deny a motion for new trial with the standard applied to the initial decision to grant the motion). The burden of demonstrating harmful error warranting a new trial falls on the party seeking the relief. *See EEOC v. Marion Motel Associates*, 763 F.Supp. 1338, 1341 (W.D.N.C.1991) (quoting 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2803 (1973) (citing and collecting cases)).

In the case at hand, TCFC argues that its Motion for a New Trial should be granted because there was (A) improperly admitted evidence and prejudice at trial; (B) testimony involving a material issue falsely proffered by Mr. Gibson; and (C) fraud perpetrated upon the court by Mr. Gibson's feigning ignorance of who was operating in his former franchise area.

### A.

In the case at hand, TCFC argues that its Motion for a New Trial should be granted because of improperly admitted evidence and prejudice at trial, specifically that: (1) Mr. Gibson's allegations of a continuing fraud concerning who was operating his former franchise should not have been part of the trial; (2) improperly admitted evidence and argument so biased the jury against TCFC that a new trial is warranted; (3) TCFC was prejudiced by the forced withdrawal of Mr. Evans as counsel and by the examination of him at trial regarding allegations of a continuing fraud; (4) TCFC was prejudiced at trial by the Court's conduct toward Mr. Evans; and (5) the admission of Mr. Campbell's testimony regarding his operation in Mr. Gibson's former territory was improper. Each alleged ground for a new trial is addressed in turn below.

## 1.

First, TCFC argues that the continuing fraud that allegedly occurred during discovery was inadmissible. However, the information that Mr. Campbell had been awarded franchise rights to the territory shortly after Mr. Labro's abandonment and that TCFC, during discovery, had attempted to disguise that fact were pertinent to both the liability and punitive damage issues. Their relevance must be examined within the context of permissible inferences arising from other evidence.

Viewed in the light most favorable to Mr. Gibson, the Plaintiff, it was TCFC's suggestion that Gibson sell his franchise rights to a third party in order to avoid the dispute with Mr. Campbell about Campbell's continuing encroachment within Gibson's territory. It was TCFC that suggested Mr. Labro as a possible purchaser. It was TCFC that appraised the value of the franchise rights and, then, approved all of the sale conditions including the security agreement, fully aware that Gibson would not enter into the sales agreement without it and knowing, at the time, that it would not allow Gibson to reclaim the franchise. It was TCFC that refused to allow Gibson to reclaim the franchise when Labro defaulted, resulting in Labro's abandonment. It was TCFC that, immediately thereafter, allowed Campbell to begin operating the territory and, shortly afterwards, transferred the rights to the territory to Mr. Campbell. Mr. Evans' represented TCFC when the rights were transferred to Campbell, and he drafted the final version of the document. Mr. Evans was General Counsel and Vice–President of TCFC at the time he answered the interrogatories; and, sometime prior to trial, he became President of TCFC.

Those inferences amply support the argument that TCFC engineered the events in order to place Mr. Campbell in Mr. Gibson's territory. Given TCFC's denial of having made a knowing misrepresentation concerning the security agreement, Gibson's ability to show a plausible motive for the misrepresentation takes on importance in proving the fraud alleged. That TCFC's General Counsel and Vice–President would take affirmative steps to avoid identifying Campbell as the frachisee, avoiding also the follow-up question about the timing of Campbell's taking over of the territory-which, in fact, occurred immediately after Labro's resignation-supports the inference that corporate officers, aware of the plan or scheme, made an affirmative effort to cover it up, thus prolonging and continuing its effect. Mr. Evans' specious explanation for his response-that he did not know who was "operating" there on a "daily basis"-makes the inference stronger, and, his refusal to amend the response and provide correct information when asked to do so makes it stronger yet.

With regard to the relevancy of the continuing fraud evidence to the punitive damage issue, the duration of a defendant's misconduct and whether there was an attempt to conceal the conduct is one factor for the jury to consider when determining an amount. *Hodges v. Toof,* 833 S.W.2d 896, 901–902 (Tenn.1992). In short, the continuing fraud evidence was admissible; and therefore, a new trial cannot be granted on these grounds.

## 2.

As the second ground supporting its Motion for a New Trial, TCFC argues that improperly admitted evidence and arguments biased the jury. As support, TCFC points to the jury's award of damages. TCFC argues that the verdict is so excessive that it cannot be justified by the evidence in the case.

The answer to this ground is twofold: First, the evidence TCFC claims to have been improperly admitted is the evidence about attempted concealment of Campbell as the operator of the franchise in Gibson and Labro's former territory. As discussed above, that evidence was relevant.

Second, the compensatory damages verdict, as indicated by the jury in its verdict form, was based on the amount of money that Mr. Gibson lost as a result of selling his franchise, measured by the defaulted amount on the promissory note from Mr. Labro. The punitive damages were approximately three times the amount of the actual damages awarded and, as discussed in Section II.C.2., trebled damages are often accepted

as an appropriate measure for deceptive conduct such as that found in this case. In addition, the punitive damage award was based on evidence regarding, among other things, TCFC's value and an effort by TCFC to conceal its wrongdoing. Given the evidence presented to the jury, the amount of the punitive damages is reasonable.

### 3.

As its third ground, TCFC contends that it was prejudiced by the forced withdrawal of Mr. Evans as counsel and by the examination of Evans at trial. Mr. Evans was both the President of TCFC and a necessary witness in the case. As previously discussed, Evan's responses to discovery were at issue and relevant to the jury's consideration of this case. Mr. Gibson's counsel did not create the issue in order to disqualify Mr. Evans, but instead pursued the issue because of its relevance to the case. The Rules of Professional Conduct generally disapprove of lawyers testifying at proceedings in which they are also advocates. *See* Model Rules of Prof'l Conduct R. 3.7(a) (2001) (stating that "[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness ...."). Therefore, Mr. Evan's withdrawal was not forced by the Court or the opposing party, but by the relevance of his role to the discovery process and the probability that he would be a witness at trial.

### 4.

Fourth, TCFC argues that it was prejudiced by the Court's conduct toward Mr. Evans. Specifically, TCFC points to the Court's question to Evans in front of the jury and the conduct of the Court's law clerk during Evans' testimony.[9]

The Fourth Circuit has held that Courts are free to ask questions and to conduct trials in any matter which helps the jury and aids in the administration of justice. *Atl. Greyhound Corp. v. Eddins*, 177 F.2d 954, 959 (4th Cir.1949). In this case, the questions by the Court were not improper. The questions posed to Mr. Evans were to clarify

matters to the jury, and did not reveal the Court's opinions in the case. In addition, the Court warned Evans on several occasions to answer the question presented by the opposing counsel, and not to present argument in the case. Several of the Court's questions were directed at preventing such arguments by Mr. Evans and at providing facts to the jury. In addition, the Court dismissed the jury before warning Evans that he was not answering the questions correctly. The jury's absence prevented the Court's comments from harming Evans' credibility with the jury.

TCFC also argues that the law clerk's actions during Mr. Evans' testimony prejudiced the jury. However, TCFC's counsel did not make a contemporaneous objection nor motion for mistrial based on the law clerk's asserted actions even though he claimed to have seen it more than once during Evans' testimony. Therefore, this issue was not properly preserved for appeal. *See Hinkle v. City of Clarksburg, W. Va.*, 81 F.3d 416, 427 (4th Cir.1996) (stating that a motion for mistrial was the proper way to preserve the issue of outside influence on jury for appeal).

Even if the issue had been properly preserved, there would be no grounds for action. The physical dimensions and configuration of the courtroom make it unlikely that a member of the jury would have been able to see the law clerk or her reactions to testimony. The law clerk was not within the field of view of someone sitting in the jury box and looking towards the witness stand. Additionally, from the jury's perspective, the law clerk was positioned behind a person taller than herself, the courtroom deputy clerk. There is no reason to believe that, even if the incident occurred, it would have had any effect on the jury.

Finally, the Court guarded against any possible bias stemming from the participation of the Court in its instructions to the jury. The Court stated in its instructions

---

**9.** TCFC asserts that the Court's law clerk shook her head and rolled her eyes during portions of Mr. Evans' testimony.

both before and after the presentation of evidence that:

Neither should you infer from anything I may have said or asked that I have any opinion about the outcome of this case or what determination you should make from the facts as you find them.

In short, there is no evidence that TCFC was prejudiced by the Court's conduct toward Mr. Evans. Therefore, a new trial cannot be granted on this reason.

### 5.

Fifth, TCFC argues that the admission of Mr. Campbell's testimony regarding his operation of Mr. Gibson's former franchise is inadmissible. TCFC argues that the Court allowed Gibson's counsel to question Campbell as to whether, during the summer of 2002, he operated the franchise territory formerly owned by Gibson. TCFC argues that this line of questioning was beyond the scope of cross-examination, and should therefore not have been admitted.

In this case, Mr. Campbell was called by Mr. Gibson as a witness in his case-in-chief. Despite his placement, Campbell was clearly a hostile witness to the plaintiff; therefore, the cross-examination by TCFC's counsel was not a traditional cross-examination, but instead afforded TCFC an opportunity to present its own evidence.

In addition, during cross-examination TCFC's counsel asked Mr. Campbell about his duties in his franchise. Campbell answered the question by describing his current actions in the territory by stating that "I still operate somewhat myself in the territory only a couple of days a week, but I'm more or less my role [sic] is pretty much as a manager." (Trial Tr. at 177.) This line of questioning generally addressed who had operated in the territory, and specifically, whether Campbell had so operated. As a result, any questions regarding who was operating in the territory are within the proper scope of cross-examination and redirect examination.

In conclusion, TCFC's Motion for a New Trial cannot be granted on the grounds of improperly admitted evidence and prejudice at trial.

### B.

TCFC also moves for a new trial on the basis that Mr. Gibson proffered false testimony involving a material issue at trial. Specifically, TCFC argues that Mr. Gibson knew before filing suit that Mr. Campbell was operating in Gibson's former territory. A verdict based on perjury is one example of the injustice to be avoided through the grant of a new trial, if necessary. *See, e.g., Isley v. Motown Record Corp.,* 69 F.R.D. 12, 16–17 (S.D.N.Y.1975). Although the Fourth Circuit has not precisely addressed the standard for granting a new trial based on the contention that the jury verdict was based on false testimony, the Sixth Circuit applies a three-prong test which this Court adopts.

The standard for granting a new trial based on false testimony is set forth in *Davis v. Jellico Comty. Hosp., Inc.,* 912 F.2d 129 (6th Cir.1990).

"[A] new trial should be granted where the court is reasonably well satisfied that the testimony given by a material witness is false; that without it, a jury might have reached a different conclusion; that the party seeking a new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after trial."

*Id.* at 133; *see also Williams v. United Dairy Farmers,* 188 F.R.D. 266 (S.D.Oh. 1999) (applying *Davis* standard to motion for new trial based on false testimony under Rule 59 in employment discrimination case); *Antevski v. Volkswagenwerk Aktiengesellschaft,* 4 F.3d 537, 540 (7th Cir.1993) (citing *Davis* for proposition that if the verdict is based on false testimony, district judge has the discretion to grant the injured party a new trial under Rule 59).

The threshold question is whether or not Mr. Gibson proffered false testimony. TCFC has presented an affidavit from Mr. Campbell stating that he had a conversation with Greg Marley, a franchisee in Campbell's franchise area. Mr. Marley, who is married to Gibson's sister, reported to Campbell that

his wife had provided information to Gibson regarding TCFC from the company's website. (Campbell Aff. ¶ 5–8.) Specifically, Campbell learned from Marley that approximately two years before trial, Marley's wife downloaded a newsletter and information regarding franchises. (Campbell Aff. ¶ 9–10.) Mr. Gibson was aware of this information for two years preceding trial. (Campbell Aff. ¶ 9.) TCFC argues that, based on this information, Gibson provided false testimony when he testified at trial that he did not know who was operating in his former franchise area.

The affidavit does not provide information sufficient to establish that Mr. Gibson proffered false testimony. Although Mr. Campbell states that the information available on the website included a list of franchisees and area developers, he does not state that the website would tell a viewer if Campbell was covering the franchise area while the company found another person to purchase it, or whether he was currently operating in it. That is, the affidavit does not provide details about the level or complexity of the information listed on the website. Contact information for people in an area would not be sufficient to show that someone had legally acquired the rights to "operate" in an area.

In addition, Mr. Campbell states that a newsletter from his Nashville district was forwarded to Mr. Gibson. The affidavit does not describe the contents of the newsletter and is again insufficient to determine if the newsletter would put Gibson on notice as to the legal status of Campbell's role in his former franchise. Gibson could easily have concluded that TCFC was just using Campbell to manage the area. As a result, the affidavit does not show that Gibson's testimony was false.

Even if it did, however, whether Mr. Gibson was subjectively aware that Campbell was operating in his old territory was material neither to an issue regarding liability nor to a determination of punitive damages. It would, of course, have been highly material had Gibson been aware that TCFC approved the security agreement with the intention of not allowing him to reclaim the territory in the event of a default by Labro. That was

the statement upon which it was necessary for Mr. Gibson to prove he relied. Whether he was subjectively aware that Campbell was operating the territory is irrelevant to TCFC's attempt to conceal the information. The effort to conceal was the relevant factor, not Gibson's actual knowledge.

### C.

■ TCFC further argues that a new trial should be granted because Mr. Gibson perpetrated fraud upon the court by feigning ignorance of who was operating in his former franchise area when he was aware that Mr. Campbell was so operating.

Under Rule 60(b), a district court has "the power in certain restricted circumstances to 'vacate judgments whenever such action is appropriate to accomplish justice.'" *Compton v. Alton S.S. Co., Inc.*, 608 F.2d 96, 101–102 (4th Cir.1979) (citations omitted). This is an "extraordinary [remedy] and is only to be invoked upon a showing of exceptional circumstances." *Id.* (citations omitted). In considering whether to vacate a judgment under 60(b), "courts must engage in the delicate balancing of 'the sanctity of final judgments, expressed in the doctrine of res judicata, and the incessant command of the court's conscience that justice be done in light of all the facts.'" *Id.* (internal citations omitted).

Rule 60(b) provides various grounds for relief from a judgment. Rule 60(b) specifically provides for relief based upon: (1) "newly discovered evidence which by the due diligence of the parties could not have been discovered in time to move for a new trial under Rule 59(b)," Fed.R.Civ.P. 60(b)(2); and (2) "fraud, misrepresentation, or other misconduct of an adverse party." Fed.R.Civ.P. 60(b)(3). A motion to vacate based on newly discovered evidence or fraud must be made within one year of the judgment. Fed.R.Civ.P. 60(b). Rule 60(b) also provides that a court may vacate a judgment when it determines that a party has perpetrated a "fraud upon the court." *Id.* Unlike a motion under Rule 60(b)(2) or (3), a motion to vacate under Rule 60(b) for fraud on the court has no time limit.

Fraud on the court under Rule 60(b) is materially different from the fraud or misconduct referred to in Rule 60(b)(3). *See Kupferman v. Consol. Research & Mfg. Corp.*, 459 F.2d 1072, 1078 (2d Cir.1972). As the Fourth Circuit has explained, "[n]ot all 'fraud is fraud on the court.'" *Great Coastal Express v. Int'l Bhd. of Teamsters*, 675 F.2d 1349, 1356 (4th Cir.1982) (citing 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2870 at 253 (1973)). Courts have construed the concept of fraud on the court very narrowly to prevent it from being "overwhelm[ed][by] the specific provision of 60(b)(3) and its time limitations and thereby subvert the balance of equities contained in the Rule." *Id.*

A party "must clear a high hurdle in order to set aside the verdict based" on fraud on the court. *Perez–Perez v. Popular Leasing Rental, Inc.*, 993 F.2d 281, 285 (1st Cir.1993). Fraud on the court is a "serious allegation ... involving corruption of the judicial process itself." *Cleveland Demolition Co. v. Azcon Scrap Corp.*, 827 F.2d 984, 986 (4th Cir.1987) (citation and internal quotations omitted). As Professor Moore's often cited formulation explains:

> Fraud upon the court should, we believe, embrace only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication. Fraud inter parties without more should not be a fraud upon the court, but redress should be left to a motion under Rule 60(b)(3) or to the independent action.

7 Moore's *Federal Practice and Procedure* § 60.33 at 515 (1971) (cited in *Great Coastal Express*, 675 F.2d at 1356); *see also Demjanjuk v. Petrovsky*, 10 F.3d 338, 352 (6th Cir. 1994) (following Moore); *Kupferman*, 459 F.2d at 1078.

Applying such a rigorous standard, courts have ordinarily limited the term "to the most egregious cases, such as bribery of a judge or juror, or improper influence exerted on the court by an attorney, in which the integrity of the court and its ability to function impartially is directly impinged." *Great Coastal Express*, 675 F.2d at 1356. *See also Lockwood v. Bowles*, 46 F.R.D. 625, 631–32 (D.D.C.1969) (listing examples of conduct rising to level of fraud on the court). In contrast, courts have held that "perjury or fabricated evidence are not grounds for relief as 'fraud on the court.'" *Great Coastal Express*, 675 F.2d at 1357 (finding that fabricated testimony did not constitute fraud on the court) (citations omitted); *Lockwood*, 46 F.R.D. at 630 (citations omitted). False testimony, standing alone, does not qualify as fraud on the court because it is an "evil[ ] that can and should be exposed at trial, and the legal system encourages and expects litigants to root them out as early as possible." *Great Coastal Express*, 675 F.2d at 1357.

However, notwithstanding that perjury is insufficient, "the involvement of an attorney, as an officer of the court, in a scheme to suborn perjury should certainly be considered fraud on the court." *Cleveland Demolition*, 827 F.2d at 986; *Great Coastal Express*, 675 F.2d at 1357. Attorneys are held to the highest standards of integrity and have an obligation as officers of the court to be candid before the Court in conducting litigation. Indeed, "[c]ases dealing with fraud on the court often turn on whether the improper actions are those of parties alone, or if the attorneys in the case are involved." *Demjanjuk*, 10 F.3d at 352; *Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 245–46, 64 S.Ct. 997, 88 L.Ed. 1250 (1944) (finding that attorney's role in submitting false article constituted a "deliberately planned and carefully executed scheme" to defraud the court).

In this case, the allegations presented do not rise to the level required under the rule. TCFC argues that Mr. Gibson and his counsel presented false evidence to the Court. The Fourth Circuit has held that presentation of perjury does not rise to the level required to show fraud on the Court. *Great Coastal Express*, 675 F.2d at 1357. In addition, TCFC does not present evidence that Gibson's counsel affirmatively knew or should have known of any possible perjury by his client. *Cleveland Demolition*, 827

282

F.2d at 987 (stating that evidence of conspiracy between client and attorney was necessary for action under Rule 60(b)). Therefore, the allegations presented do not constitute fraud on the court as defined under Federal Rule of Procedure 60(b).

As discussed in the previous section, the question of exactly when Mr. Gibson subjectively may have become aware that Mr. Campbell had taken over Gibson's old territory was not relevant to proving his claim or damages. It was TCFC's attempt to conceal the information, not whether Gibson was already aware of the information, that was relevant.

In short, TCFC's Motion for a New Trial on the fraud claim will be DENIED.

## IV.

For the reasons set forth above, the Defendant's Motion for Judgment after the Trial, or in the alternative for Amended Judgment [Doc. # 93] will be GRANTED IN PART and DENIED IN PART. However, Defendant's Motion for a New Trial on the Fraud Claim [Doc. # 95] will be DENIED.

## ORDER

For the reasons set forth in a contemporaneously filed Memorandum Opinion, Defendant's Motion for Judgment after the Trial, or in the alternative for Amended Judgment [Doc. # 93] is GRANTED IN PART and DENIED IN PART. Specifically, the Judgment entered on April 28, 2003 [Doc. # 77] will be amended, pursuant to Federal Rule of Civil Procedure 59(e), to reflect total compensatory damages of $176,124, and not $220,155. Remaining portions of the April 28, 2003 Judgment will remain unchanged.

Further, Defendant's Motion for a New Trial on the Fraud Claim [Doc. # 95] is DENIED.

## AMENDED JUDGMENT

For the reasons set forth in a contemporaneously filed Memorandum Opinion, the Judgment entered on April 28, 2003 [Doc. # 77] is amended, pursuant to Federal Rule of Civil Procedure 59(e), to reflect total compensatory damages of $176,124, and not

$220,155. The punitive damage award of $550,000 and the award of costs pursuant to Federal Rule of Civil Procedure 54(d)(1) remain unchanged.